

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5092 | **DATE** | 3/5/2004 |
| **CASE TITLE** | | Annecca Inc., et al vs. Lexent, Inc. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order.  Lexent's motion for summary judgment is granted and this action is dismissed. (64-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | MAR 0 8 2004 | |
| | Notified counsel by telephone. | date docketed | 74 |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 3/5/2004 | |
| SN | courtroom deputy's initials | date mailed notice SN | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANNECCA INC., et al.,           )
                                )
                Plaintiffs,     )
                                )
        v.                      )    No.   02 C 5092 **DOCKETED**
                                )
LEXENT, INC.,                   )
                                )         MAR 0 8 2004
                Defendant.      )

MEMORANDUM OPINION AND ORDER

Annecca, Inc. and its co-plaintiffs[1] (collectively
"Annecca," treated after this sentence as a singular noun for
convenience) have sued Lexent, Inc. ("Lexent"), asserting that
Lexent breached a 29-page single-spaced printed Stock Purchase
Agreement ("Agreement"), which called for Lexent's acquisition of
the ownership interests in Annecca, Inc. and its affiliated
companies, when Lexent terminated the Agreement and refused to
fulfill the remainder of its obligations. Lexent has since moved
for summary judgment under Fed. R. Civ. P. ("Rule") 56 on the
premise that it was entitled to terminate the Agreement and to
cease performance pursuant to its terms because Annecca had not
satisfied several of the conditions precedent specified there.

Analysis shows that Annecca has not raised a genuine issue
of material fact as to whether it had already fulfilled all of
the conditions precedent in dispute, or as to whether it could

_____

[1] Those co-plaintiffs comprise T.N.C., Inc., U.S. Electric,
LLC, The Michael J. Annecca Living Trust, Inc., Michael Annecca
and Andrew Denon.

reasonably have done so if Lexent had provided it with a cure opportunity under the Agreement. Accordingly Lexent's motion is granted, and this action is dismissed.

## Rule 56 Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, (477 U.S. 317, 322-23 (1986)).[2] For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). What follows is

---

[2] This District Court's LR 56.1 implements Rule 56 by requiring parties to submit evidentiary statements and responses to such statements, to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Lexent's LR 56.1 statement as "L. St. ¶--," to Annecca's LR 56.1 statement as "A. St. ¶--" and to their respective responses as "A. Resp. ¶--" and "L. Resp. ¶--." Where either party's LR 56.1 statement is undisputed by the other, the opinion includes only a citation to the original statement. "L." and "A." designations are also used to refer to all other documents submitted by the parties.

a summary of the facts--viewed of course in the light most favorable to nonmovant Annecca.

## Factual Background

Annecca, Inc. and its affiliated companies are in the business of outsourcing local telecommunications services (L. St. ¶2). Lexent is a corporation that provides outsourced local telecommunications network services (L. St. ¶1). Federal jurisdiction is based on the requisite total diversity of citizenship between all plaintiffs on the one hand and Lexent on the other.

On February 14, 2001 Lexent entered into the Agreement with all of the owners of the stock of Annecca, Inc. and its related companies, pursuant to which Lexent was to acquire all of the ownership interests in those entities (again for convenience collectivized here as "Annecca")(L. St. ¶8; Agreement Art. II).[3] Annecca and Lexent planned the Closing (a defined term) of the deal on April 1, 2001, although that date could have been delayed based on several delineated contingencies (Agreement §1.2).

Agreement Arts. VII and VIII expressly stated that each side's performance at Closing was subject to the satisfaction of several conditions precedent by the other side. Many of the conditions precedent created identical responsibilities for both

_____

[3] Throughout the Agreement Annecca is designated as "Sellers" and Lexent as "Buyer."

3

parties.  Thus Agreement §§7.1 and 8.1 were captioned "Truth of Representations and Warranties" and read:

> The representations and warranties of [Sellers in Agreement §7.1, Buyer in Agreement §8.1] contained in this Agreement, and all representations and warranties set forth in any Exhibit or Schedule attached hereto, shall be true, complete and correct as of the Closing Date except as otherwise set forth herein, without the necessity of any amendment or modification....

And Agreement §§7.2 and 8.2 were captioned "Performance" and set out another condition precedent applicable to both parties:

> Each of the agreements, obligations, conditions and covenants to be performed or complied with by [Sellers or any of them in Agreement §7.2, Buyer in Agreement §8.2] on or before the Closing Date pursuant to the terms hereof shall have been duly performed or complied with on or before the Closing Date....

Other conditions precedent were party-specific.

Importantly, Agreement §7.11 required Annecca to have a Net Worth (as defined by the Agreement) of at least $9 million as of the Closing Date.  And to return to a now-critical two-way provision, Agreement §9.1 provided that either party could terminate the Agreement before the Closing Date if the other party had not met its particular conditions precedent:

> Notwithstanding any other provision contained herein to the contrary, this Agreement may terminate at any time prior to the Closing Date...(b) by Buyer, if any of the conditions provided in Article VII hereof have not been met by the Closing Date; or (c) by Sellers, if any of the conditions set forth in Article VIII shall not have been met by the Closing Date.

As part of its acquisition process, Lexent enlisted the services of two separate teams from PricewaterhouseCoopers LLP

("Pricewaterhouse") to assist with due diligence and to audit Annecca (L. St. ¶¶22-23). Pricewaterhouse carried out its assignments and reported to Lexent before the scheduled Closing Date.

On March 29, 2001 Lexent notified Annecca by letter (L. Ex. J, confirming an earlier telephonic advice) that it was exercising its Agreement §9.1(b) termination option (A. St. ¶49; L. St. ¶55). Lexent asserted two main reasons for its choice, though it said that they did not represent "a complete list of Lexent's reasons for terminating":

   1. Annecca's net worth was "very substantially and materially less than the $9 million threshold at the end of 2000," as required by the Agreement.

   2. Annecca's records and financial statements were so incomplete, and in some instances inaccurate, that they could not provide Lexent with a sufficient understanding of Annecca's critical financial condition.

Michael Annecca spoke with a Lexent representative that same day, stating that Annecca still wished to proceed with the acquisition and inquiring about what he could do to change Lexent's decision (A. St. ¶50). On April 4, 2001 Annecca also sent a letter to Lexent (L. Ex. K) stating that Annecca was sincerely disappointed with Lexent's decision to terminate the Agreement and expressing concern that Lexent had made that

5

decision "based on flawed information" (A. St. ¶51). Lexent did
not respond to the April 4 letter, its representative having
previously told Michael Annecca that its termination decision was
final (A. St. ¶¶50, 52).

## Application of Rule 56 Standards

Agreement §11.9 states (and neither party disputes) that New
York law controls the present dispute (L. St. ¶18). And under
New York law a party bringing a breach of contract claim must
prove the existence of a contract, its own performance, breach by
the other party and damages (First Inv. Corp. v. Liberty Mut.
Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)).

As already stated, Agreement Art. VII and VIII explicitly
designate several of each party's obligations as "conditions
precedent" to the other party's performance. In New York (as in
all other jurisdictions) an express condition precedent is an act
or event agreed upon by the parties that, unless excused, must
occur before a duty to perform a subsequent promise arises
(Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d
415, 418 (N.Y. 1995)). Express conditions precedent must be
literally performed--substantial compliance is not enough to
compel the other party's performance of its resultant obligation
(id. at 418-19). And although such a result may sometimes seem
harsh, courts should be wary of reorganizing or excusing express
conditions precedent and thereby upsetting the will of the

parties, because the operation of conditions precedent is generally integral to a contract (id. at 418).

Agreement §9.1(b) also specifically granted Lexent the right to terminate the Agreement if Annecca failed to fulfill <u>any one</u> of the conditions precedent listed there (<u>Marcantonio v. Rousso</u>, 684 N.Y.S.2d 567, 568 (App. Div. 1999). Hence Lexent cannot be liable to Annecca for assertedly breaching the Agreement if Annecca cannot raise a genuine issue of material fact as to its having performed <u>all</u> of the conditions precedent to Lexent's obligations (<u>Rachmani Corp. v. 9 E. 96th St. Apartment Corp.</u>, 629 N.Y.S.2d 262, 269 (App. Div. 1995); <u>Morse v. Ted Cadillac, Inc.</u>, 537 N.Y.S.2d 239, 240 (App. Div. 1989)). And this opinion's ensuing account of the relevant facts reveals that even when the record is viewed in Annecca's favor, Annecca unquestionably failed to meet more than one of the conditions precedent to Lexent's obligations.

<u>Annecca's Failure To Satisfy Conditions Precedent</u>

First and of vital importance, Agreement §7.11 required Annecca to have a Net Worth of "at least Nine Million Dollars" as of the Closing Date. "Net Worth" was defined as "the stockholders' equity or members' capital...as shown on the Closing Balance Sheets" (Agreement §1.11).

In its March 9 due diligence report Pricewaterhouse preliminarily estimated Annecca's Net Worth at about $8.75

7

million (L. St. ¶29; L. Ex. E at L00012). Pricewaterhouse's more precise March 28 work product--its audit report--placed Annecca's Net Worth at December 31, 2000 at only a bit over $7.2 million (L. St. ¶32; L. Ex. G at L09535). Even Annecca's own accountants ultimately estimated its Net Worth for the same time frame as no more than $8.5 million (or even as low as $7.2 million)(L. St. ¶33; A. St. ¶41).

Annecca contends that those numbers are irrelevant because they are based on documentation as of the end of December 2000, while Agreement §7.1 referred to Annecca's Net Worth on the Closing Date of April 1, 2001 (A. St. ¶44; A. Mem. 13). But that contention falls flat, because Annecca itself has asserted, based on a later-prepared report by an accounting firm that it retained months later, that "on or about March 31, 2001" its Net Worth was between $8.4 and $8.9 million (A. Resp. ¶34). So no evidence at all supports any notion that the critical Net Worth condition precedent was met--only the amount of the shortfall has not been agreed upon, and as this opinion later reflects the very existence of a shortfall was noncurable and hence fatal to Annecca's position in this litigation.

Annecca Mem. 10 and 13-14 argue, as a fallback position, that this price adjustment provision in Agreement §3.2(b) required Lexent to proceed regardless of whether Annecca's Net Worth was less than the contractual floor of $9 million:

8

> To the extent that the combined Net Worth of Annecca...excluding the Excluded Assets, is less than Nine Million Dollars ($9,000,000.000) and Seller has not elected to terminate this Agreement, the cash portion of the Purchase Price shall be decreased accordingly, on a dollar for dollar basis.

But that position is really untenable, because it would effectively read out of the Agreement the key clause "and Seller [Annecca] has not elected to terminate this Agreement"--a clause that necessarily could come into play only if Annecca <u>had</u> such a right of termination. Indeed, the very inclusion of that clause by the sophisticated contracting parties provides a powerful-- really a conclusive--showing that no other circumstance would call for such an adjustment in the purchase price.

Because Annecca had no such right of termination, it cannot call the Agreement §3.2(b) price reduction provision to its aid. Instead, in the absence of some breach on Lexent's part that would confer on Annecca a right to terminate,[4] <u>Lexent</u>'s right to terminate under Agreement §9.1, based on Annecca's failure to satisfy the $9 million condition precedent, remains intact. Only such a reading comports with the basic rule of contract interpretation that requires every clause to have some purpose (<u>Bombay Realty Corp. v. Magna Carta, Inc.</u>, 790 N.E.2d 1163, 1165

---

[4] No such breach is disclosed by the undisputed facts--and Annecca will not of course be permitted to bootstrap itself by pointing to any asserted breach by Lexent (in the form of its exercise of its own right to terminate) that the analysis in this opinion rejects.

(N.Y. 2003)).[5]

Because the Agreement confers a right of termination on Lexent if a shortfall exists on Annecca's part as to any one condition precedent, Lexent's decision to terminate the Agreement would have been fully justified by Annecca's just-confirmed failure to meet the Net Worth condition precedent. But there was more: Annecca also failed to satisfy the Agreement §7.1 condition precedent that all of its representations and warranties had to be true, complete and correct as of the Closing Date. Most notably, Annecca did not produce 2000 Financial Statements that Agreement §4.4(a)(i) required to be in compliance with generally accepted accounting principles ("GAAP"):

> The 2000 Financial Statements: (A) will be correct and complete in all material respects...(B) will be prepared in accordance with GAAP consistently applied throughout the periods covered...(D) will present fairly the consolidated financial condition....

While Annecca admits that the balance sheets it originally created and tendered to Lexent were not in compliance with GAAP

---

[5] Even if the two provisions just discussed were to be read differently, so that they were arguably in conflict, Lexent would still have another potential string to its bow that Annecca does not: Agreement §9.1 (the termination provision) begins with the language "Notwithstanding any other provision contained herein to the contrary," an overriding clause that is conspicuously absent from Section 3.2(b). That contrast teaches that Agreement §9.1 trumps Agreement §3.2(b) (Handlebar Inc. v. Utica First Ins. Co., 735 N.Y.S.2d 249, 251 (App. Div. 2002); Seaman-Andwall Corp. v. Wright Mach. Corp., 295 N.Y.S.2d 752, 755 (App. Div. 1968)).

(A. Resp. ¶¶37, 39),[6] it attempts to escape from that
acknowledged deficiency by claiming (A. Mem. 15) that the
ultimate obligation to create the 2000 Financial Statements
belonged to Lexent (or more specifically to Lexent's agent,
Pricewaterhouse), so that the absence of GAAP-compliant balance
sheets assertedly could not be a failure of a condition precedent
that warranted Lexent's termination decision.  But as with the
other respects in which Annecca has mischaracterized terms of the
Agreement, what it urges here does not track with Agreement
§1.13's definition of "2000 Financial Statements":

> "2000 Financial Statements" shall mean the balance
> sheets...and the related statements of income and cash
> flows for the year then ended, together with related
> footnotes, which shall be prepared in accordance with
> GAAP...and shall have been audited by
> PricewaterhouseCoopers.

Annecca attempts to latch onto the phrase "and shall have
been audited by PricewaterhouseCoopers" as purportedly making
Pricewaterhouse responsible for creating the underlying GAAP-
compliant balance sheets that would form a component of the
Agreement-defined "2000 Financial Statements."  But that position
reflects a fundamental misconception of the respective roles

---

[6]   What Annecca fails to note--or prefers to ignore--is that
such noncompliance is itself a direct violation of its
representation to the contrary in Agreement §4.4(a)(ii).   In
turn, Agreement §7.1 made the truth of that and all other
representations and warranties as of the Closing Date a condition
precedent to Lexent's obligation to close the deal.   And no
evidence exists to suggest that the untruth was (or could have
been) cured by the Closing Date.

11

occupied by management and the accounting profession in the generation of audit reports: It is management's responsibility to produce a company's financial statements that are the grist for the independent accountants' mill, and it is then the accountants' role to render an opinion as to the adequacy (or inadequacy) of those management-prepared statements.[7]

Both the standards of the accounting profession and, perhaps more importantly, the language of Agreement §1.13 refute the Annecca position. They plainly distinguish between the functions of <u>preparing</u> the balance sheets and other underlying financial statements and the <u>audit</u> of that raw material, with Pricewaterhouse being made responsible <u>only</u> for auditing the already GAAP-compliant balance sheets prepared by Annecca (perhaps with the assistance of its own accountants). That division of function was in turn anticipated to produce the "2000 Financial Statements" as defined by Agreement §1.13 and referred to in Agreement §§4.4(a)(i) and 4.4(c). Moreover, as n.6 reflects, Agreement §4.4(a)(ii) expressly placed on <u>Annecca</u> the responsibility for providing GAAP-compliant financials for

_____

[7]   Although what has just been said in the text should be known by any business lawyer (or any litigator who becomes involved in business litigation), this opinion has attached as its App. 1 the "Report of Independent Accountants" that forms the opinion portion of the Pricewaterhouse March 28, 2001 audit report (L. Ex. G). That is a model of what the standards of the accounting profession require, and its first paragraph conforms precisely to what this opinion has just stated.

consideration by Pricewaterhouse in performing its auditing role.

To reshape the Agreement's provisions into a requirement that Pricewaterhouse had to create GAAP-compliant balance sheets for Annecca (as opposed to just auditing the already created GAAP-compliant balance sheets) would fly in the face of the unambiguous language chosen by the parties (<u>Collard v. Vill. of Flower Hill</u>, 421 N.E.2d 818, 823 (N.Y. 1981)). Indeed, Annecca's proposed reading of that language is not a reasonable one within the expectations of the parties--experienced and savvy representatives of business entities (see <u>Petracca v. Petracca</u>, 756 N.Y.S.2d 587, 588 (App. Div. 2003); L. St. ¶24).[8]

Annecca's misreading of Agreement §1.13 extends further to its assertion (A. Mem. 15) that the Agreement §1.2 provision for extension of the Closing Date for up to a month if Lexent did not receive the "2000 Financial Statements" somehow indicates that Pricewaterhouse was responsible for creating the documents. Not so--remember that part of the definition of "2000 Financial

_____

[8] Annecca proffers an affidavit by its own accountant stating that in his "professional experience...it is not uncommon" in the case of closely-held private companies for accountants to create and audit financial statements simultaneously (A. Mem. 16 n.7; A. Ex. N. ¶7). But even if that statement is credited, it does not raise a genuine issue of material fact in this instance, where the stated opinion as to what may occur in other situations is directly at odds with the unambiguous contract language that specifies otherwise in the transaction now at issue (<u>Excess Ins. Co. v. Factory Mut. Ins. Co.</u>, 769 N.Y.S.2d 487, 489 (App. Div. 2003); <u>British Int'l Ins. Co. v. Seguros La Republica, S.A.</u>, 342 F.3d 78, 82 (2d Cir. 2003)).

Statements" calls for the <u>audit</u> (not the preparation) of financial documents by Pricewaterhouse. Hence all that Agreement §1.2 calls for is pushing back the Closing Date if Pricewaterhouse could not complete its audit function by the originally anticipated Closing Date.

Nor does Lexent's awareness that Annecca's balance sheets were not GAAP-compliant at the outset of the negotiations alter the unambiguous terms of the Agreement as to conditions precedent (A. St. ¶¶4(e), 4(h); A. Resp. ¶42). What Agreement §4.4(a)(i) specifies looks to the future, not the past—it requires that the "2000 Financial Statements...<u>will</u> be prepared in accordance with GAAP." Moreover, the effect of the integration clause in Agreement §11.8 is that any such claim based on asserted prior oral understandings or arrangements is precluded (<u>Marine Midland Bank-S. v. Thurlow</u>, 425 N.E.2d 805, 807 (N.Y. 1981)).

Finally, in addition to the just-described shortcomings as to the 2000 Financial Statements, it has already been pointed out that Annecca clearly breached its Agreement §4.4(a)(ii) representation that its "books, records and accounts...accurately and fairly reflect [its] transactions, assets and liabilities in accordance with GAAP." In that respect Annecca Mem. 19 insists that the quoted requirement was merely an obligation to ensure that its books were sufficiently adequate and complete so that an audit could eventually be conducted according to GAAP (A. Ex. S

14

¶8). Annecca is wrong.

To begin with, it is worth noting that requiring a company's books and records to be kept in accordance with GAAP is common parlance in contracts (see, e.g., <u>Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va., L.L.C.</u>, 144 F. Supp.2d 241, 243 (S.D. N.Y. 2001) and <u>AUSA Life Ins. Co. v. Ernst & Young</u>, 991 F. Supp. 234, 238 (S.D. N.Y. 1997)). But on a more case-specific basis, the representation stated in the Agreement was breached here in literal terms: Pricewaterhouse auditors specifically described Annecca's books as "clearly not in accordance with GAAP" (L. Ex. R. at 103).

Suppose arguendo, despite that literal breach, that the Agreement were to be read as Annecca would have it: that Annecca's books and records merely had to be amenable to a GAAP-compliant audit. Even if such a skewed reading were accepted, Annecca unquestionably failed to meet even such a less demanding standard. Representatives of Pricewaterhouse characterized their work on the Annecca matter as a "very, very messy audit" based on their difficulty in finding information and on the generally poor condition of Annecca's books (L. Ex. R at 79-80). And Annecca's own accountant acknowledged that its books and records were not as complete and accurate as they could have been (A. St. ¶¶4(a)-

15

(d), (4)(1)).[9]

In sum, there is no genuine issue of material fact that can fend off the determination that just a few days before the scheduled Closing Date Annecca had not satisfied more than one of the Agreement's conditions precedent to Lexent's obligation to close. Indeed, even if Annecca's contentions as to the adequacy of its financials were to be viewed as more persuasive than this opinion has found them to be, its shortfall in Net Worth terms would alone have given Lexent the right to terminate legitimately under Agreement §9.1.[10]

### Opportunity To Cure

Annecca makes one last effort to avert defeat: It urges

---

[9] Annecca's "evidence" to the contrary on this point (and on many others as well) consists of an affidavit by its accountant containing the unsubstantiated observation that Annecca's books and records "fully and fairly represented" its financial condition and "were sufficient to create" GAAP-compliant financial statements (A. St. ¶48). Especially in the face of the particularized difficulties described by Pricewaterhouse, such general and conclusory statements do not raise a genuine issue of material fact sufficient to stave off summary judgment (Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001)).

[10] Relatedly, there is no evidence that Lexent lost its right to terminate by preventing or otherwise frustrating Annecca's efforts (as in Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc., 522 N.Y.S.2d 292, 293 (App. Div. 1987)). Obviously Lexent did not cause Annecca's deficiency in its Net Worth. And because under the Agreement Annecca alone (and not Pricewaterhouse) was responsible for ensuring that Annecca's balance sheets, books, and records were GAAP-compliant, Lexent's decision to sever its relationship with Pricewaterhouse before that firm completed its final audit does not amount to such prevention or frustration (A. St. ¶20).

16

that Lexent breached the Agreement by not giving Annecca an opportunity to cure its failure to satisfy the conditions precedent that have been identified here. In that regard Agreement §7.7 provides:

> In the event that Buyer's due diligence review shall disclose any condition of matter which Buyer, in its sole reasonable judgment, deems to be unsatisfactory, Buyer shall notify Sellers in writing of such unsatisfactory condition or matter within ten (10) days of Buyer's determination, and Seller's [sic] shall then have the period of thirty (30) days from the date of Buyer's written notice to correct the condition or matter to the sole reasonable satisfaction of Buyer, or Buyer may terminate this Agreement on ten (10) days written notice to Sellers.

But Annecca's effort to invoke that provision fails as well. In light of (1) the material shortfall in Annecca's Net Worth and (2) the disastrous non-GAAP-compliant state of its balance sheets and other books and records, it cannot be gainsaid that Annecca would have been unable to cure those deficiencies if Lexent had followed the path marked out in the quoted opportunity-to-cure provision.

As in other jurisdictions, the courts applying New York law recognize that there are circumstances in which one party need not offer the other party a contractually-specified or implied cure opportunity (Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991); Needham v. Candie's, Inc., No. 01 Civ. 7184, 2002 WL 1896892, at *4 (S.D. N.Y. Aug. 16)). Express repudiation, abandonment of performance,

17

unfeasibility of cure and--critical to this case--incurability
are some of the circumstances that justify a party's decision to
bypass the cure requirement and proceed directly to termination
(Needham, 2002 WL 1896892, at *4). Those exemplify the general
principle that once it becomes clear that one party cannot live
up to its obligations under a contract, the other party is not
required to perform futile acts in furtherance of the contract
(Oak Bee Corp. v. N.E. Blankman & Co., 551 N.Y.S.2d 559, 562 (App.
Div. 1990) (per curiam)).

To be sure, the existence of an explicit cure provision in a
contract calls for a suitably narrow scope to be given to the
judicially sanctioned futility exception, to avoid the functional
elimination of that cure provision from the contract (Petracca,
756 N.Y.S.2d at 588; Filmline (Cross-Country) Prods., Inc. v.
United Artists Corp., 865 F.2d 513, 518-19 (2d Cir. 1989)).[11]
But given Annecca's complete inability to raise a genuine issue
of material fact as to its ability to have cured its noncompliant
conditions precedent to Lexent's obligation to close the

---

[11]    Somewhat astonishingly, this proposition is the only one
for which Annecca cites or refers to any court opinion in the
course of its 20-page memorandum (see A. Mem. 9).  And to boot,
despite both sides' recognition that New York law supplies the
rules of decision, that single unpublished, and by definition
nonprecedential, opinion is by a Magistrate Judge from this
district and looks to Illinois law (E. Trading Co. v. Refco,
Inc., No. 97 C 6815, 2001 WL 869626, at *3 (N.D. Ill. Aug. 1)).
No matter, for Annecca's position does not carry the day in any
event.

purchase, the circumstances here fall squarely within such a narrow scope.

As to the Net Worth requirement, Annecca Mem. 10 asserts that because Michael Annecca "had the fiscal ability to infuse" $2 million in capital contributions into Annecca, any problems with Annecca's current Net Worth were curable (A. St. ¶64). But that ignores the obvious difference between the net worth of a business that is being purchased as a going concern when that net worth has resulted from its preacquisition activities and the net worth of that same business that is artificially boosted by the injection of cash.

To highlight that distinction, hypothesize a business that is being acquired on a multiple-of-earnings basis, with the expectation that its net worth comprises business assets (including normal working capital) of a nature that can properly generate the desired level of earnings. Now suppose the business to be acquired turns out to have only half of those business assets and is therefore capable of generating only half of the contemplated level of earnings. It simply will not do for the seller to prime the going business with cash in the form of an artificial one-time capital contribution, a contribution that would present the buyer with a dramatically different deal from the one for which it had bargained. Such a cash infusion, when coupled with the preexisting going concern assets, would

obviously not generate the same kind of business results as the originally contemplated full-blown net worth business assets--the bargained-for acquisition.[12]

Nor is that a farfetched illustration, though it is concededly stated in somewhat more dramatic terms than the factual scenario here--recall that the Pricewaterhouse March 28, 2001 audit, on which Lexent relied for its termination decision, showed Annecca's Net Worth to be only 80% of the Agreement's $9 million floor. And there is also the added consideration that the proceeds of the acquisition were going directly to Michael Annecca, so that allowing him to satisfy the Net Worth condition precedent with his own funds would effectively force Lexent to engage in the dollar-for-dollar price reduction arrangement that Agreement §3.2(b) provided only if <u>Annecca</u> had a right to terminate (as it did not).

As for whether Annecca had a realistic prospect of curing

---

[12]  Annecca's Mem. 10 n.4 refers to a statement during the deposition of Lexent's CEO Alf Hansen that it characterizes as having expressed the view that "it would have been more desirable if the cash account of the Companies was higher upon its acquisition." But even leaving aside the fact that Annecca has not tendered the cited pages of that deposition, so that this Court cannot see exactly what the witness said and in what context, there is a total difference between (1) an expression that Lexent would have been pleased if the business it had contracted to acquire had accomplished its financial results, and had in the process amassed some added cash, and (2) the quite different business situation described in the text. That testimony, however it may read in fact, in no way derogates from the force of the just-stated analysis.

its various GAAP-compliance problems so as to render the futility exception unavailable, its contention to that effect is at best dubious. On that score Annecca would have to point to a material factual indication (with the benefit of the required favorable inferences) that if it had known Lexent was questioning its performance it could have scrambled feverishly to rework its balance sheets, books and records into compliance with GAAP (A. St. ¶¶51, 57)?

In that regard Annecca's accounting expert opines that Pricewaterhouse "could have easily have completed" [sic] a GAAP opinion on the combined financial statements within the time required by the Agreement (including the extension periods outlined in Agreement §1.2)(A. St. ¶24). Once again that opinion misses the division of functions specified in the Agreement: Instead the question is whether <u>Annecca</u> could have cured its independent obligation to come forward with balance sheets, records and books that were consistent with GAAP within the requisite time frame--not whether Pricewaterhouse could then have timely finished its audit upon being furnished with those clean financial records. That seems highly problematic (to say the least) in light of the chapter and verse provided by Pricewaterhouse as to the hopelessly messy nature of the Annecca records (a position effectively confirmed by how long it took Annecca and its hired accountants to come up with some decent

financials post-termination).

But perhaps this Court need not resolve that issue in ultimate terms, for the application of the futility exception to the Net Worth deficiency alone defeats Annecca's opportunity-to-cure argument. In that respect Lexent was clearly justified in making the decision that offering a cure opportunity would be futile, so that it was entitled to avail itself of its termination right immediately (contrast Engels v. French, 711 N.Y.S.2d 487, 488 (App. Div. 2000)).

## Conclusion

There is no genuine issue of material fact that could support a determination either (1) that Annecca actually satisfied all of the conditions precedent that were required of it under the Agreement or (2) that it could reasonably have fixed matters so as to require Lexent to adhere to the Agreement's cure provision. Thus Lexent's decision to terminate was, as a matter of law, not a breach of the Agreement (Oak Bee, 551 N.Y.S.2d at 561-62). Accordingly Lexent is entitled to a judgment as a matter of law, and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 5, 2004